UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
United States of America        :

       :     Case No. 10 Cr. 333-01 (RJH)

       :

          v.           :

       :

Jules Robbins        :

         Defendant      :

-------------------------------------------------------x


## DEFENDANT'S SENTENCING MEMORANDUM


Dated: New York, New York          SCHULTE ROTH & ZABEL LLP
       September 2, 2010           919 Third Avenue
                                    New York, New York 10022
                                    (212) 756-2000

                                    *Attorneys for Defendant Jules Robbins*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................................................1

BACKGROUND ............................................................................................................................3

I.    Jules Robbins' Personal History......................................................................................3

      A.    Early Years During the Great Depression ...............................................................3

      B.    Voluntary Enlistment in the United States Army and Combat Service in the
            European Theater During World War II ..................................................................4

      C.    Marriage and Raising of a Family ..........................................................................5

      D.    The Founding and Management of Webster Watch ................................................6

      E.    Retirement Years and Grandchildren .....................................................................8

      F.    Current Health Status..............................................................................................8

II.   The Nature of the Offense ...............................................................................................9

      A.    Mr. Robbins' UBS Account ....................................................................................9

      B.    Mr. Robbins' Disclosure of his Offshore Account, Amendment of his Returns and
            Payment of $1 Million to the IRS *Before* Being Contacted by the Government....9

      C.    Mr. Robbins' Guilty Plea......................................................................................11

      D.    The Severe Financial Penalty That Mr. Robbins Has Paid ..................................11

ARGUMENT................................................................................................................................13

I.    Post-*Booker* Sentencing:  The Applicable Legal Standard ...........................................13

II.   The Advisory Guidelines Authorize A Sentence Of Probation, Without Any
      Incarceration .................................................................................................................15

III.  The Section 3553(a) Factors Support A Sentence Of Probation ....................................17

      A.    Mr. Robbins' "History and Characteristics" Support A Sentence of Probation....17

            1.    Mr. Robbins' Personal History Supports A Sentence of Probation..............17

            2.    Mr. Robbins' Service In World War II Supports A Sentence of Probation .17

i

3.      Mr. Robbins' Age and Health Support A Sentence of Probation.................18

4.      Mr. Robbins' Post-Offense Acceptance of Responsibility Was Extraordinary
        And Supports A Sentence of Probation.........................................................19

B.      The Nature and Circumstances of the Offense Support a Sentence of Probation .20

1.      Mr. Robbins' Offense Involved No Tax Loss ...............................................20

2.      A Sentence of Probation Adequately Reflects The Seriousness of the
        Offense.........................................................................................................21

C.      A Sentence of Probation Provides Adequate Deterrence and Protects the Public.22

D.      A Sentence Of Probation Is Appropriately Imposed Under Section 3553(a)(3)...22

E.      A Sentence Of Probation Will Avoid The Creation Of Unwarranted Sentence
        Disparities Between Mr. Robbins And Other Defendants With Similar Records
        Who Have Been Found Guilty Of Similar Conduct...............................................23

1.      A Sentence Of Imprisonment Would Create Disparities With Other
        Defendants Who Have Been Sentenced In The Other UBS Taxpayer Cases
        .....................................................................................................................23

2.      Sentencing Mr. Robbins To A Term Of Imprisonment Would Create
        Unwarranted Disparities With Other Tax Cases ..........................................25

CONCLUSION...............................................................................................................26

# TABLE OF AUTHORITIES

**CASES** PAGE(S)

*Gall v. United States*,
552 U.S. 38 (2007)..................................................................................................14, 21

*Kimbrough v. United States*,
552 U.S. 85 (2007)........................................................................................................18

*Porter v. McCollum*,
130 S. Ct. 447 (2009).............................................................................................. 17-18

*Ratzlaf v. United States*,
510 U.S. 135 (1994)......................................................................................................13

*United States v. Bajakajian*,
524 U.S. 321 (1998)......................................................................................................13

*United States v. Booker*,
543 U.S. 220 (2005)............................................................................................13, 14, 15

*United States v. Cavera*,
550 F.3d 180 (2d Cir. 2008)................................................................................ 13-14, 15

*United States v. Chase*,
560 F.3d 828 (8th Cir. 2009) .................................................................................15, 18

*United States v. Dorvee*,
No. 09-0648-cr., 2010 WL 3023799 (2d Cir. Aug. 4, 2010) .............................................14, 15

*United States v. Gardellini*,
545 F.3d 1089 (D.C. Cir. 2008).......................................................................................25

*United States v. Gordon*,
No. 03 Cr. 1115-03, 2007 WL 162491 (S.D.N.Y. Jan. 22, 2007) ...........................................19

*United States v. Gray*,
453 F.3d 1323 (11th Cir. 2006) .....................................................................................15

*United States v. Hodges*,
No. 07-CR-706, 2009 WL 366231 (E.D.N.Y. Feb. 12, 2009)..................................................19

*United States v. Howe*,
543 F.3d 128 (3d Cir. 2008)..........................................................................................17

iii

*United States v. McFarlin,*
535 F.3d 808 (8th Cir. 2008) ..................................................................................18

*United States v. Ministro-Tapia,*
470 F.3d 137 (2d Cir. 2006)...........................................................................14, 17

*United States v. Pflum,*
556 F. Supp. 2d 1254 (D. Kan. 2008)......................................................................25

*United States v. Samas,*
561 F.3d 108 (2d Cir. 2009) ....................................................................................14

*United States v. Tomko,*
562 F.3d 558 (3d Cir. 2009)....................................................................................25

**STATUTES**

18 U.S.C. § 3553(a) ...........................................................................................*passim*

18 U.S.C. § 3661.....................................................................................................15

26 U.S.C. 7206(a) ...................................................................................................11

31 U.S.C. § 5321(a)(5) ...........................................................................................12

N.Y. Penal Law § 65.05...........................................................................................16

**REGULATIONS**

31 C.F.R. § 103.24(a) ......................................................................................... 11-12

**GUIDELINES AND SENTENCING COMMISSION REPORTS**

Federal Sentencing Guidelines Manual,
U.S.S.G. § 2T1.1 ....................................................................................................15

U.S.S.G. § 3E1.1 ....................................................................................................16

U.S.S.G. § 5C1.1(c)(3)............................................................................................16

U.S.S.G. § 5H1.11....................................................................................................

*Sourcebook of Federal Sentencing Statistics* ("*Sourcebook*"), Table 27, *available at*
http://www.ussc.gov/ANNRPT/2009/Table27.pdf.................................................25

*Sourcebook of Federal Sentencing Statistics* ("*Sourcebook*"), Table 31C, *available at*
http://www.ussc.gov/ANNRPT/2009/Table31c.pdf ..................................................................25

United States Sentencing Commission, *Alternative Sentencing in the Federal Criminal Justice System* (Jan. 2009), *available at*
http://www.ussc.gov/general/20090206_Alternatives.pdf................................................. 22-23

United States Sentencing Commission, *Amendments to the Sentencing Guidelines*,
*available at* http://www.ussc.gov/2010guid/finalamend10.pdf ...............................................18

United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004), *available at*
http://www.ussc.gov/publicat/Recidivism_General.pdf ...........................................................19

United States Sentencing Commission, *Recidivism and the "First-Offender"* (May 2004),
*available at* http://www.ussc.gov/publicat/Recidivism_FirstOffender.pdf ...............................22

United States Sentencing Commission, *Statistical Information Packet, Fiscal Year 2009, Southern District of New York*, Table 8, *available at*
http://www.ussc.gov/JUDPACK/2009/nys09.pdf ....................................................................25

United States Sentencing Commission, *Use of Guidelines and Specific Offense Characteristics: Fiscal Year 2009*, *available at*
http://www.ussc.gov/gl_freq/09_glinexgline.pdf ......................................................................20

## OTHER AUTHORITIES

*The Army Almanac: A Book of Facts Concerning the Army of the United States*, U.S. Government Printing Office (1950), *available at*
http://www.history.army.mil/html/forcestruc/cbtchron/cc/066id.htm ........................................5

IRS Release, *Real Estate Developer Igor Olenicoff Pleads Guilty To Filing A False Tax Return and Fails to Disclose Foreign Bank Accounts to IRS* (Dec. 12, 2007), *available at*
http://www.irs.gov/newsroom/article/0,,id=212163,00.html .....................................................23

Janet Novack, *U.S. Agrees Guilty Billionaire Shouldn't Go To Jail, Forbes.com* (Apr. 2, 2008),
http://www.forbes.com/2008/04/02/taxes-irs-olenicoff-biz-billies-cx_jn_0402olenicoff.html 23

Stars and Stripes, *66th: The Story of the 66th Infantry Division*, *available at*
http://www.lonesentry.com/gi_stories_booklets/66thinfantry/index.html ...................................5

## PRELIMINARY STATEMENT

This memorandum is respectfully submitted on behalf of our client, Jules Robbins, in connection with his upcoming sentencing, scheduled for September 8, 2010.

Mr. Robbins is 84 years old. He is to be sentenced on his guilty plea to charges that he filed false federal income tax returns. The purpose of this memorandum is to demonstrate that the most appropriate sentence would be a period of probation, with (a) no incarceration or home detention, as recommended in the Presentence Investigation Report ("PSR"); and (b) no additional monetary penalty, as, pursuant to a plea agreement with the Government, he already will have paid a civil penalty of $20.83 million. The plea agreement contains a stipulated Sentencing Guidelines calculation that -- even if Mr. Robbins is sentenced *within* the Guidelines range -- would permit a sentence of probation involving a period of home detention in lieu of incarceration. We respectfully submit, however, that the Probation Office is correct in recommending a downward variance and a sentence involving *neither* home detention nor incarceration.

These circumstances start with Mr. Robbins' personal history. Born into poverty as a child of immigrants, Mr. Robbins, other than in connection with the false tax returns that give rise to this case, has led a long, productive, giving and exemplary life. He voluntarily enlisted during World War II and engaged in combat against the Nazi military. He built a business, raised and provided for a family, and, as reflected in numerous letters that have been submitted to the Court, is recognized by those who know him as caring and generous. Now elderly and a doting grandfather, with a constellation of medical problems rendering him somewhat fragile physically, he has been a doer of good deeds.

Second, Mr. Robbins' tax offenses -- consisting of his failure to report to the IRS a foreign account at UBS established with approximately $200,000 more than 40 years ago --

while felonies and serious, did not include tax evasion. This is because Mr. Robbins' failure to disclose his offshore account did not result in tax avoidance, and the prosecutor does not allege to the contrary.

Third, Mr. Robbins demonstrated extraordinary acceptance of responsibility for his crime when he filed amended tax returns that disclosed his offshore account and voluntarily, at his own initiative, paid $1 million against any possible anticipated future liabilities, without any promise of leniency, before any government agent knocked on his door and even though ultimately there was no charge of any federal tax evasion or even any federal tax shortfall. When the Government did establish contact with him via the service of grand jury subpoenas, he quickly agreed to negotiate a plea agreement. That agreement requires the payment of a massive civil penalty in the amount of $20.83 million, for failing to disclose his foreign account. These steps reflect Mr. Robbins' deep contrition and regret -- "genuine[] remorse" as described by the Probation Office (PSR ¶ 22) -- for having committed his offense.

Fourth, the punishment already suffered by Mr. Robbins, even without imprisonment or any type of confinement, is more than sufficient to satisfy the goals of sentencing set forth in Section 3553(a). With respect to specific deterrence, there is no chance that Mr. Robbins will ever be a criminal defendant in the remainder of his life. With respect to general deterrence, no one would look at the severe punishment meted out here, despite the absence of tax evasion -- more than $21 million in total payments and the consequent wiping out of approximately 80% of his net worth, the stigma of felony convictions in federal and state court, the attendant public and intra-family humiliation from such convictions, strict restrictions on his daily life, and the emotional effect of all of this on an 84-year-old widower with cardio-vascular problems -- and conclude that tax crimes are lightly punished. A sentence of probation also would avoid creating

2

unwarranted disparities with other sentenced UBS account holders. Because a sentence of probation amply satisfies the factors in Section 3553(a)(2), a more severe sentence should not be imposed. The punishment of Mr. Robbins already has been profound and devastating.

We respectfully ask the Court to take these facts into account, follow the recommendation of the Probation Office, and impose a sentence of probation without home detention.

## BACKGROUND

I.      Jules Robbins' Personal History

        A.      Early Years During the Great Depression

Jules Robbins was born on August 29, 1926 in Brooklyn, New York.[1]  His parents, Irving and Hannah Rabinowitz, were both Russian immigrants who came to the United States in the early 1900s.  Both worked as manual laborers in the garment industry, his father as a presser and his mother as a finisher.

Jules was a child of the Great Depression.  His father suffered periodic bouts of unemployment during Jules' childhood.  Some of Jules' earliest memories are of his father leaving the house every morning, hoping to find some work to support his family, but coming home without having been able to locate work.  Although Jules says that his family never starved, he has described his childhood as "hand to mouth."  Despite the adversities that his family faced, Jules recalls that his parents were loving and that they did their best to instill in him the values of hard work, respect for others, and proper behavior.

Jules was his parents' first child.  In 1933, Jules' only sibling, Nancy Landau, was born. She described her older brother Jules as being "like a second father" to her.  (Exhibit 4).  Jules

---

[1] Mr. Robbins' name at birth was Jules Rabinowitz.  He changed his name due to encountering anti-Semitic bigotry while looking for work unsuccessfully in the chemical industry in the early 1950s.

3

protected her from bullies in the rough East New York/Brownsville neighborhood of Brooklyn, New York in which they grew up. Jules' parents spoke only Yiddish in the home, and Jules entered school "not speaking a word of English." He determined to teach his younger sister how to speak English so that she would not start school with this disadvantage.

B.    Voluntary Enlistment in the United States Army and Combat Service in the European Theater During World War II

After Jules graduated from Franklin K. Lane High School in 1943, he studied chemistry and chemical engineering at Brooklyn College before enlisting in the United States Army. Jules' sister Nancy recalls how Jules "campaigned [to his parents] continuously" to be permitted to enlist in the Army "to help win the war." (Exhibit 4). Jules persuaded his nervous parents to let him enlist by promising to take advantage of the G.I. Bill's guarantee of a free college education. (*Id.*).

Jules enlisted in the United States Army Specialized Training Program ("ASTP"), which provided a mix of academic and military training to high school graduates who qualified by passing an examination. In 1944, when the Army's need for soldiers outpaced its ability to recruit or draft young men, Jules was taken out of ASTP and sent to basic training and then to the European theater. While in Europe, he fought in the Northern France campaign and served in the infantry. After one year, Jules was promoted to private first class.

Jules saw live combat in Germany and received a combat infantryman's badge, as well as several other decorations and citations (such as the European African Middle Eastern Campaign Medal, the World War II Victory Medal, the Army of Occupation Medal, and the Good Conduct Medal). For much of his service, Jules served in the 66th Infantry Division, known as the "Black Panther Division." Jules recalls being involved in frequent skirmishes near the heavily-fortified

4

German submarine bases at Saint-Nazaire and La Rochelle, France.[2] Jules' division saw fierce combat in the war's final months, with the Germans making "savage counter-thrusts."[3]

After Germany's surrender in May 1945, the 66th Division, including Jules, spent a brief period of time occupying Germany and then headed to Southern France, near Marseilles, to help prepare troops who were being redeployed to the Pacific Theater. Jules also served as a military police officer in Southern France during the reconstruction of Europe. He received his honorable discharge from the United States Army in August 1946.

C.      Marriage and Raising of a Family

During the Summer of 1951, Jules worked as a waiter at Scaroon Manor, a summer resort on Schroon Lake in the Adirondack Mountains. There, he met Cecil Lewin, working at the resort as a dancer and dance teacher. They were married in 1952, and remained so for 48 years, until Cecil's death in 2000 from a very lengthy bout with breast cancer. Cecil first developed breast cancer in 1988, and she suffered multiple recurrences of the disease prior to her death. Jules nursed her through her final illness, taking care of her at home and never leaving her side. Since her death, Jules has lived alone. The letters of support that have been submitted by Jules'

---

[2]  According to *The Army Almanac: A Book of Facts Concerning the Army of the United States*, U.S. Government Printing Office (1950), at 546-57, the mission of the 66th Infantry Division during this period was to "contain[] the enemy in the St. Nazaire and Lorient pockets[.]"  This mission "was carried out by daily reconnaissance patrols, limited objective attacks, and the maintenance of harassing and interdictory fires on enemy installations. A heavy German attack near La Croix was repulsed, 16 April 1945, and several strongly emplaced enemy positions were taken, 19–29 April 1945. Enemy troops in the Lorient and St. Nazaire pockets surrendered to the Division upon the end of hostilities in Europe, 8 May 1945. The 66th moved to Germany on occupation duty, in the Koblenz subarea, 20 May 1945, and left for Marseille, 26 May 1945."  This book excerpt is reprinted on the Internet, *available at* http://www.history.army.mil/html/forcestruc/cbtchron/cc/066id.htm (last visited Aug. 31, 2010),

[3]  According to a booklet published by Stars and Stripes, entitled *66th: The Story of the 66th Infantry Division*, "[a]rtillery duels between the division and the enemy were frequent and heavy," as in April 1945 some "66,000 shells [were] lobbed into the resisting pockets."  In response, the Germans "fought back with savage counter-thrusts," which included "[f]requent enemy patrols [being] sent out to harass 66th positions, backed up by artillery fire that ranged in size from 75mm to 340mm. Several times there were enemy build-ups for attacks in vital areas, but because of quick diversion of American and French troops to the threatened areas they never advanced beyond artillery stage."  The text of this booklet is reproduced on the Internet, *available at* http://www.lonesentry.com/gi_stories_booklets/66thinfantry/index.html (last visited Aug. 31, 2010).

5

friends and family describe the great devotion that Jules showed to Cecil during her long illness, and even after her death. As their older son Steven has explained, Cecil's death "devastat[ed]" Jules. (Exhibit 2). One life-long friend, Dorothy Schimel, observed that Cecil's death "nearly destroyed Jules." (Exhibit 5). She explained that "[t]o this day, he preserves everything in his home that she purchased and arranged, just as she left it," adding that "her voice still answers his cellphone," as Jules has left her voicemail greeting on his phone. Since her death ten years ago, he has visited her grave every Sunday. (Exhibit 2).

Together, Jules and Cecil raised three children: Linda, Steven and David, born in 1954, 1956 and 1963, respectively. After living in Queens, the Robbins family moved to Jericho, Long Island in 1960, where they lived in a newly-built house in a development. The house was constructed on a potato field, "surrounded by nothing but dirt and a driveway." Jules seeded the soil and planted shrubbery to make their new house look like a home. (Exhibit 2). As the son of immigrants who grew up in harsh circumstances, Jules wanted to give his children the sort of quintessential American childhood that he was not able to enjoy. His children recall that he loved to spend family time at home when he was not on the road for business, and that he was a patient and kind father who was very much involved in their lives and activities. (Exhibits 1-3). Bobbie Jodre, who lived next door to the Robbins family as a 9-year old girl, remembers Jules as a "friendly, warm and genuine" neighbor who helped her feel welcome in a new neighborhood in which she was a stranger. (Exhibit 6)

D.    The Founding and Management of Webster Watch

After Jules returned from World War II, he enrolled again at Brooklyn College and completed his education, receiving his Bachelor of Science degree in Chemistry. In 1952, Jules was introduced to and began working in the watch business. He found his way to a job at the Mentor Watch Company, typing invoices in the morning and working as a commission salesman

6

in the afternoon. Jules proved to be a very talented salesman, and his employer, Bernard Schaffel, invited Jules to start a new company, which they named Webster Watch. The two men remained partners until Schaffel's death in 1977, when Jules became the sole manager.

Webster Watch sold inexpensive watches to people of relatively modest economic means. (Exhibit 2). When Webster Watch was formed, Schaffel and Robbins divided up the business responsibilities: Schaffel was responsible for buying watches from manufacturers and Robbins was responsible for selling watches to stores. From the mid-1950s into the 1970s, Jules was constantly traveling to meet with customers. Most of his customers were in the eastern and midwestern United States, from New York City to Chicago, as far north as the Canadian border. Webster Watch sold to large chain stores, like Kmart or Family Dollar, but also to many "Mom and Pop" stores in small towns. In order to meet with customers in every town, Jules embarked on repeated multi-week car trips, driving from New York to Albany to Syracuse to Buffalo, then on to Cleveland and Cincinnati, and finally ending in Chicago, having stopped in many other smaller cities and towns along the way. Over time, the business succeeded, and Webster Watch, headquartered in New York City, employed as many as 25-30 people.

Jules worked hard in order to provide for his family. As his children got older, Linda and David both came to work at Webster Watch, learning about the business from their father. They described how Jules developed a reputation as an honest and reliable businessman in the community of watch manufacturers and store purchasers in which he spent his life. (Exhibits 1, 3). Jules continued to manage Webster Watch until his retirement in 2000. He has remained involved in the business on an occasional basis, providing advice to his children who manage the business. (Exhibit 3).

7

E.    Retirement Years and Grandchildren

All three of Mr. Robbins' grown children live in New York City. Jules has played an active part in the lives of his six grandchildren, who range in age from 5 to 21. In recent years, Jules has been particularly involved in helping to raise his 5-year old grandson, Jesse, and his 7-year old granddaughter, Cayla, both of whom live on the West Side of Manhattan. Jules baby-sits for Jesse and Cayla twice a week and attends events at their school. (Exhibit 3). Jules also often sees his grandson Alex (16) at family dinners and other gatherings; he is Alex's only living grandparent. (Exhibit 1). Two of Jules' grandchildren, Marc (17) and Mick (14), live in New Jersey with their mother, and Jules sees them at family barbeques and also travels to see them play basketball and football. Jules' oldest grandchild, Skyler (21), is a student at Northwestern University. Jules is very close to his grandchildren and an absence from their lives for any period of time would be traumatic to them.

F.    Current Health Status

Jules turned 84 years old on August 29, 1010. He has suffered from a variety of ailments in recent years that have required medical treatment. His most serious medical condition is what one doctor described as "very severe occlusive coronary disease." (Exhibit 10). This condition was first diagnosed in September 1980, when Jules suffered a heart attack. In the aftermath of his heart attack, he was hospitalized at North Shore Medical Center in Manhasset, New York for 11 days. (Exhibit 11). Stress tests have revealed that he has "a highgrade obstruction most likely occurring in the right coronary artery." (Exhibit 12). He develops chest pain (*i.e.*, angina) during "times of increased physical exertion and increased emotional stress." (Exhibit 13).

Although some doctors initially advised him to have a bypass operation to treat his clogged arteries, Jules elected to opt for a medical treatment of the condition, which required a change in diet and other steps to reduce the likelihood of further occlusion of his arteries.

8

(Exhibit 10). Over time, Jules' condition has stabilized, but he remains at constant risk of a heart attack, and his chest tightens on exertion and when under stress. He currently takes Inderal (a beta blocker that treats a variety of heart conditions) and Lipitor (to lower cholesterol). Jules' heart condition is monitored through periodic stress tests and other diagnostic procedures.

In 2003, Jules was treated surgically for a sigmoid volvulus, which is a painful colon condition that causes bowel obstruction and loss of blood flow. As a result of complications from the surgical procedure, Mr. Robbins was given a colostomy. (Exhibit 14). He was in the hospital for several days after the operation. Doctors reversed the colostomy when his colon healed. Also, in the past decade, Mr. Robbins had a hip replacement operation and also had a cancerous growth removed from his face.

II.     The Nature of the Offense

A.      Mr. Robbins' UBS Account

As the Information alleges, Jules Robbins has held an offshore account at UBS AG ("UBS"), in Zurich, Switzerland (and at banks that UBS acquired) since 1967. Based on advice that he received from Swiss advisors and bankers, he held the account in the name of a trust and ultimately in the name of a corporation. The account was never a typical cash "bank account." Rather, the initial $200,000 deposit was invested in securities -- mostly U.S. stocks -- that were largely held long-term. Over 40 years, the securities appreciated substantially in value, until that value was reduced by approximately half due to the recent worldwide financial collapse. Mr. Robbins' failure to disclose that account in his personal tax returns gave rise to these charges.

B.      Mr. Robbins' Disclosure of his Offshore Account, Amendment of his Returns and Payment of $1 Million to the IRS *Before* Being Contacted by the Government

In his guilty plea before Magistrate Judge Ellis, Mr. Robbins took full responsibility for his conduct. More than that, however, Mr. Robbins voluntarily took major steps to address his

9

conduct responsibly several months before learning of any investigation against him. In particular, before government agents served grand jury subpoenas on Mr. Robbins and his accountants, he disclosed his offshore account to the Internal Revenue Service ("IRS").

Mr. Robbins made this disclosure by filing with the IRS full and accurate amended returns reflecting the existence of the UBS account, and the income derived therefrom. The process of reconstructing the information necessary to file these returns was time-consuming and expensive. Before the process was completed, Mr. Robbins notified the IRS of the existence of the account by filing foreign bank account report forms ("FBARs"). He simultaneously submitted a check for $1 million in the event that any taxes, penalty or interest were deemed to be due -- even though it is now uncontroverted by the prosecutor that no federal tax was due and owing. The check was submitted prophylactically in case he owed taxes on dividend income and capital gains in the account. In July 2009, Mr. Robbins filed fully amended, accurate tax returns for 2002 through 2007. He took these steps even though he knew that by filing these documents he was admitting that he had a previously undisclosed offshore account.

Predictably, on October 22, 2009, following the submission of the amended returns and the $1 million check, federal and state agents served grand jury subpoenas on Mr. Robbins and his accountants. Counsel to Mr. Robbins promptly contacted the government and asked to discuss a possible disposition of the case that involved a guilty plea to a felony charge and Mr. Robbins' full acceptance of responsibility. In response to the subpoenas, Mr. Robbins produced thousands of pages of responsive documents without objection. Later, in February 2010, when state prosecutors (who, in connection with Mr. Robbins' state tax obligations were working with the Government in a coordinated fashion) asked Mr. Robbins for a tolling agreement so that they could continue their investigation, Mr. Robbins readily agreed. In short, even before his guilty

10

plea, Mr. Robbins demonstrated full acceptance of responsibility without any assurance that his actions would provide a benefit in the ultimate resolution of his case.

C.     Mr. Robbins' Guilty Plea

On April 15, 2010, Mr. Robbins pleaded guilty to a five-count Information. Each count alleges the same offense for each year between 2003 and 2007: filing a false tax return, in violation of Title 26, United States Code, Section 7206(a). The Information alleges that the returns were false because they failed to disclose the existence of the UBS account, or the dividend income or capital gains derived from it. The Information does not charge him with tax evasion or with any other offense. There is no allegation of crimes related to the derivation or use of assets in the account, and no assertion that they constitute the proceeds of illegality of any kind. Indeed, the Government does not contradict that the increase in the size of the account from the original $200,000 with which it was started in 1967 has been attributable to prudent savings and securities investing.

No tax evasion charge exists because substantial amounts of tax were withheld from Robbins' income in the account to pay for taxes between 2003 and 2007 (*i.e.*, the years for which Mr. Robbins pleaded guilty to filing a false return). In fact, the amount of tax withheld was far *more* than was necessary to pay for Mr. Robbins' federal taxes. To put it differently, if Mr. Robbins had simply disclosed his account and declared the income and withholding in the account, he would have received a net *refund* of $145,109 for the 2003 to 2007 tax years.

D.     The Severe Financial Penalty That Mr. Robbins Has Paid

Despite the absence of any federal tax due, Mr. Robbins' plea agreement required him to make a payment of approximately $20.83 million to the federal government as a civil penalty for his failure to file an FBAR for the years from 2003 to 2007. FBARs must be filed by all

11

individuals who have an interest in an offshore bank account. *See* 31 C.F.R. § 103.24(a).[4]  Mr. Robbins was unaware of this specific legal requirement, and he did not file FBARs.  The applicable statute provides for maximum financial penalties for a failure to file an FBAR in the amount of 50% of "the balance in the [undisclosed] account at the time of the violation."  31 U.S.C. § 5321(a)(5)(C)(i)(II) and (D)(ii).  Here, the Government computed the $20.8 million FBAR penalty amount -- upon which the Government insisted as a condition of entering into Mr. Robbins' plea agreement -- by deriving from UBS records the highest market value in the account at any given time between 2003 and 2007 -- approximately $41.6 million at December 31, 2007 -- and multiplying that figure by 50%.

Based on our review of court files and press accounts, it appears that Mr. Robbins is paying the largest FBAR penalty -- by far -- of any prosecuted UBS depositor.  Moreover, the consequences of the 50% penalty to Mr. Robbins are far greater than, for example, the consequences of such a penalty to a holder of a cash account.  At December 31, 2007, Mr. Robbins' account did not contain $41.6 million in *cash*, but contained *securities* that, as of that date, had a market value of that amount.  That this "value" was ephemeral and consisted merely of paper gains was made manifest by the 2008 stock market collapse, in which the securities in Mr. Robbins' account lost approximately half of their value.

Thus, by the time of Mr. Robbins' 2010 plea agreement, the market value of the assets in the account was not even sufficient to provide funds to pay the full $20.83 million FBAR penalty -- much less to leave him with 50% of the account, as seems to be contemplated by the FBAR statute.  As a result, he must utilize savings and assets *other* than those in the UBS account in order to pay the penalty.  Unlike a defendant with an undisclosed cash account, Mr. Robbins is

---

[4] "FBAR" stands for "Foreign Bank Account Report."  The form's official designation by the Department of Treasury is a "Report of Foreign Bank and Financial Accounts TD F 90-22.1."

paying a penalty on the basis of unrealized gains that have long since evaporated. Moreover, the payment of the penalty results in the elimination of all but approximately 22% of Mr. Robbins' total net worth. (PSR ¶ 63). As a result, he must also face the additional, painful consequence of drastically reducing the estate that he so fervently hoped he would leave for his children and grandchildren. These facts render the imposition of this penalty even more punitive.

Mr. Robbins recognizes, of course, that he has no one to blame but himself, in not reporting the account, for these dire financial consequences. But, especially in light of the fact that taxes were withheld on income in his account, the consequences are, indeed, dire, and therefore, we respectfully submit, an important factor in considering whether any additional punitive measures are necessary. Moreover, Mr. Robbins' payment of a $20.8 million penalty further reflects his profound sense of responsibility for his conduct. He has foregone substantial legal arguments that could have resulted in successfully challenging this penalty.[5] Mr. Robbins has sacrificed these arguments, elected not to put the Government to its proof, and paid this painful, draconian penalty. He sincerely hopes that the Court will agree that no further punishment is necessary.

## ARGUMENT

I.      Post-*Booker* Sentencing: The Applicable Legal Standard

More than five years after the Supreme Court's landmark decision in *United States v. Booker*, 543 U.S. 220 (2005), it is now "emphatically clear" that the "Guidelines are guidelines - - that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en

---

[5] For example, in *United States v. Bajakajian*, 524 U.S. 321, 334 (1998), the Supreme Court held that compelled forfeiture of the entire amount subject to a reporting requirement was "disproportional to the gravity of [the] defendant's offense" and therefore a violation of the Eighth Amendment's Excessive Fines Clause. Also, in *Ratzlaf v. United States*, 510 U.S. 135, 136-37 (1994), the Court held that to prove a violation of the currency reporting statute, the government must show that the defendant failed to comply with a known legal duty, a heavy burden that the Government also would have been required to carry in a civil FBAR penalty proceeding against Mr. Robbins.

13

banc). The Guidelines are no longer "the only consideration" at sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). Rather, the Court is to impose sentence after "mak[ing] an individualized assessment based on the facts presented" in a particular case. *Id.* Each case is assessed in light of the factors set forth in Title 18, United States Code, Section 3553(a) ("Section 3553(a)"). *Id.*; *Booker*, 543 U.S. at 259-60.

Under the "parsimony clause" in Section 3553(a), the Court is to impose a sentence that is "'sufficient, but not greater than necessary to comply with the specific purposes'" of sentencing set forth in Section 3553(a)(2). *United States v. Dorvee*, No. 09-0648-cr., 2010 WL 3023799, at *7 (2d Cir. Aug. 4, 2010) (amending prior decision at 604 F.3d 84) (quoting *United States v. Samas*, 561 F.3d 108, 110 (2d Cir. 2009)). The four specific purposes of sentencing identified in Section 3553(a)(2) are as follows:

> [T]he need for the sentence imposed --
>
> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2); *see also Dorvee*, 2010 WL 3023799, at *7 n.5. The court must impose the least severe sentence that will serve these purposes of sentencing. "Plainly, if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not . . . impose the higher." *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006).

14

In applying Section 3553(a)(2) and its parsimony clause, the Court also looks to the other Section 3553(a) factors. *See Dorvee*, 2010 WL 3023799, at *7. These factors include not only the Guidelines, but "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6). The Court may consider any fact that it deems relevant to sentencing; no factors are proscribed from consideration. *See, e.g., Cavera*, 550 F.3d at 190-91; 18 U.S.C. § 3661 ("No limitation shall be placed on the information . . . which a court . . . may receive and consider for the purpose of imposing an appropriate sentence.").

After *Booker*, judges have granted downward variances based on a host of factors, including "advanced age, prior military service, health issues" and "lack of a criminal history[.]" *United States v. Chase*, 560 F.3d 828, 831 (8th Cir. 2009) (holding that such factors should have been considered by district court in considering whether to grant downward variance); *see also United States v. Gray*, 453 F.3d 1323, 1325 (11th Cir. 2006) (affirming greater than 50% downward variance based on age, "prior minimal criminal record," and medical condition).

II.     The Advisory Guidelines Authorize A Sentence Of Probation, Without Any Incarceration

Mr. Robbins and the Government entered into a plea agreement that sets forth the Guidelines calculations for this case. The Probation Office has also adopted these calculations:

- First, in the absence of any tax loss, the plea agreement provides for a base offense level of six. *See* U.S.S.G. § 2T1.1(a). (PSR ¶ 32).

- Second, Mr. Robbins' offense level is then increased from 6 to 12 due to the imposition of an enhancement for sophisticated means. *See* U.S.S.G. § 2T1.1(b)(2).[6] (PSR ¶ 33).

---

[6] The defense stipulated to this enhancement because it is mandatory if the offense involved the use of offshore financial accounts. *See* U.S.S.G. § 2T1.1, comment. (n.1) (stating that the enhancement should be imposed, *inter alia*, in cases involving offshore accounts). We are aware, however, of no allegations concerning

15

- Third, after receiving a 2-level reduction for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, Mr. Robbins was left with an adjusted offense level of 10. (PSR ¶ 38).

Mr. Robbins is in Criminal History Category I, placing him in an advisory Guidelines range of 6 to 12 months, which is within Zone B of the Sentencing Table.[7] (PSR ¶ 69). Because Mr. Robbins is in Zone B, the Guidelines do not advise that Mr. Robbins must be sentenced to any term of imprisonment. Even if sentenced *within* the Guidelines range, he is eligible to be sentenced to probation, so long as the Court imposes six months' home detention. *See* U.S.S.G. § 5C1.1(c)(3) (providing that where the applicable Guidelines range is in Zone B, the minimum may be satisfied by a sentence of probation that substitutes home detention for imprisonment).

Accordingly, should the Court decline to grant our application, or accept the Probation Office's recommendation, for a downward variance, we ask that it exercise its discretion under the Guidelines to sentence Mr. Robbins to probation with a condition of home detention in lieu of imprisonment. For the reasons set forth below, however, we respectfully submit that, as the Probation Office has recommended, a sentence involving neither imprisonment *nor* home

---

"sophisticated means" other than the basic fact giving rise to this case -- the opening and maintenance of an unreported offshore account in the name of an entity created by Mr. Robbins.

[7] As part of his plea agreement in this case, the Government required that Mr. Robbins plead guilty to state tax charges that related to nondisclosure of the same offshore account. Mr. Robbins pleaded guilty in New York Supreme Court to charges brought by the New York District Attorney on May 3, 2010. He was sentenced to a conditional discharge on May 19, 2010. A conditional discharge is imposed where the Court, "having regard to the nature and circumstances of the offense and to the history, character and condition of the defendant, is of the opinion that neither the public interest nor the ends of justice would be served by a sentence of imprisonment and that probation supervision is not appropriate." N.Y. Penal Law § 65.05(1)(a). A person sentenced to a conditional discharge is "released with respect to the conviction for which the sentence is imposed without imprisonment or probation supervision but subject . . . to such conditions as the court may determine." N.Y. Penal Law § 65.05(2). Apart from completion of his term of conditional discharge, he has otherwise satisfied all obligations imposed by virtue of his prosecution in state court, including payment of all sums demanded by New York State authorities.

16

detention is the most appropriate sentence, *i.e.*, under *Ministro-Tapia*, the lowest sentence that would fulfill the sentencing purposes set forth in Section 3553(a).[8]

III.     The Section 3553(a) Factors Support A Sentence Of Probation

      A.     Mr. Robbins' "History and Characteristics" Support A Sentence of Probation

            1.     Mr. Robbins' Personal History Supports A Sentence of Probation

Mr. Robbins should receive a downward variance, as recommended in the PSR, in part because he has lived an unblemished and law-abiding life apart from this conviction. We do not ask the Court to overlook his criminal conviction, but rather to consider the conviction in the context of his entire personal history. We ask the Court to give due weight to the letters of support submitted by Jules' friends and family. (Exhibits 1-9). They recount how Jules stood by them during the difficult moments in their lives, and they have provided the Court with insights that are absent from the other documents filed in this proceeding. They reflect a long and giving life filled with devotion to family and friends in profound ways. To the extent that a defendant warrants a degree of "life credits" for good and productive deeds in his past, Mr. Robbins is clearly such a defendant. His personal history supports a sentence of probation.

            2.     Mr. Robbins' Service In World War II Supports A Sentence of Probation

Mr. Robbins record as a World War II combat veteran shows that at a very young age he was prepared to make the ultimate sacrifice in defense of our country. His military service is a testament to his character and to his personal courage and it supports a downward variance. *See United States v. Howe*, 543 F.3d 128, 139 (3d Cir. 2008) (holding that military service, combined with other factors, justifies a downward variance). The Supreme Court recognized last year that "[o]ur Nation has a long tradition of according leniency to veterans in recognition of their

---

[8]     While the Probation Office also recommended a modest fine of $2,000, we respectfully submit that in light of the over $21 million that Mr. Robbins will have paid, no additional monetary penalty is necessary.

service, especially for those who fought on the front lines[.]" *Porter v. McCollum*, 130 S. Ct.
447, 455 (2009); *see also Kimbrough v. United States*, 552 U.S. 85, 110 (2007) (approving of
reliance on defendant's combat service in Iraq as one basis to affirm below-Guidelines sentence);
*Chase*, 560 F.3d at 831 (holding that 63-year old defendant could seek variance based on
"advanced age," "prior military service" and "health").[9]  While Mr. Robbins' brave service in
combat against Nazi Germany does not excuse or justify his crime, it does provide further
support for a non-Guidelines sentence.

        3.      Mr. Robbins' Age and Health Support A Sentence of Probation

Mr. Robbins suffers from a variety of health problems that are perhaps to be expected for
someone who is 84 years' old. His advanced age and fragile health support a downward
variance, or at a minimum, a term of home detention and probation rather than incarceration.
Even a short term of imprisonment will be far more punitive for Mr. Robbins, who is quite old
and suffers from medical conditions, than it would be for someone who is young or middle-aged.

Mr. Robbins' coronary artery disease has been carefully treated through a mix of
medication and regular diagnostic testing, but common sense suggests that imprisonment may
interfere with his treatment and harm his health. The host of medical procedures and
hospitalizations that he has endured in recent years, including a hip replacement, the removal of
a portion of his colon (which required a temporary colostomy), and skin cancer, indicate that
imprisonment presents additional risks to Mr. Robbins. *See United States v. McFarlin*, 535 F.3d
808, 810-11 (8th Cir. 2008) (granting variance for a 56-year old defendant with several health
problems, including "severe coronary artery disease," and who had multiple prior operations).

---

[9] Even the Sentencing Commission has finally recognized in its most recent proposed amendments that military service is a "traditional mitigating factor at sentencing." *See* United States Sentencing Commission, *Amendments to the Sentencing Guidelines*, at 10 (proposing revision of Guidelines Section 5H1.11), *available at* http://www.ussc.gov/2010guid/finalamend10.pdf (last visited Sept. 1, 2010).

18

Also, someone of Mr. Robbins' age who has a clean record is highly unlikely to recidivate. Other courts have granted downward variances based on the low risk of recidivism that an older defendant presents. *See, e.g., United States v. Hodges*, 07-CR-706 (CPS), 2009 WL 366231, at *8 (E.D.N.Y. Feb. 12, 2009) ("The Guidelines do not take into account the inverse relationship between age and recidivism."); *United States v. Gordon*, 03 Cr. 1115-03 (RWS), 2007 WL 162491, at *2, *5 (S.D.N.Y. Jan. 22, 2007) (discussing variance granted to co-defendant, from 37 months to probation, based on age (64) and "change in attitude and rehabilitation").[10]

4.      Mr. Robbins' Post-Offense Acceptance of Responsibility Was
Extraordinary And Supports A Sentence of Probation

An additional factor that strongly supports a downward variance is that before becoming aware of the grand jury investigation, Mr. Robbins took significant steps to correct and account fully for his conduct. He sent a $1 million check to the IRS -- even though it turns out that there was no federal tax deficiency -- and he filed FBAR forms and accurate amended income tax returns disclosing the existence of the UBS account. He did all of this without the benefit of any program or promise that guaranteed him more lenient treatment in exchange.

Many people in Mr. Robbins' situation would have done otherwise, hoping not to be discovered through bureaucratic error. After having been discovered, some might have tried to wait out the government's investigation and prosecution (particularly at the age of 84). Instead, Mr. Robbins acknowledged his wrongdoing before government agents knocked on his door and then quickly waived every possible right: indictment, discovery, pretrial motions, trial,

---

[10] Only 6.2% of defendants who are -- like Mr. Robbins -- older than 50 years' old and in Criminal History Category I are ever arrested again, let alone convicted. *See* United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 28 (May 2004), *available at* http://www.ussc.gov/publicat/Recidivism_General.pdf (last visited Sept. 1, 2010). Given that "[r]ecidivism rates decline relatively consistently as age increases," *id*. at 12, it reasonably can be assumed that the statistical recidivism rate for someone who is 84 years' old is even lower than 6.2%.

19

Guidelines litigation, and appeal. He even agreed to erase some 80% of his life savings by paying a $20.83 million FBAR penalty that exceeded the remaining balance of his offshore account, despite available legal arguments that this amount should not be required. These measures reflect exceptional acceptance of responsibility and support a sentence of probation.

    B.    The Nature and Circumstances of the Offense Support a Sentence of Probation

        1.    Mr. Robbins' Offense Involved No Tax Loss

Notwithstanding the fact that Mr. Robbins' returns were false because they omitted reference to the UBS account and income earned in it, there is no allegation here of any tax loss to the government, since taxes were withheld on income in the account. Thus, Mr. Robbins neither deprived the government of tax revenue during this period, nor benefited from retaining for himself tax payments that were due to the government. On the contrary, Mr. Robbins was entitled to receive a net *refund* of approximately $145,000 for the years from 2003 to 2007. The absence of tax loss is exceptional, found in only 2% of all tax cases sentenced last year.[11]

In addition, despite the application of the "sophisticated means" enhancement under the Guidelines, Mr. Robbins was no more sophisticated than were tens of thousands of other taxpayers with undisclosed offshore accounts. Holding the account in the name of a nominee corporation was not an idea devised by Mr. Robbins, nor was he the only UBS account holder advised by UBS and Swiss professionals to make such an arrangement.

Finally, the value of the assets in Mr. Robbins' offshore account has no bearing on his culpability. Although the account did contain assets with a temporary market value of over $41 million in December 2007, this is only because Mr. Robbins' deposit of $200,000 in 1967 substantially appreciated in market value over time. Whether the stock market is up (as it was in

---

[11] *See* United States Sentencing Commission, *Use of Guidelines and Specific Offense Characteristics: Fiscal Year 2009*, at 62, *available at* http://www.ussc.gov/gl_freq/09_glinexgline.pdf (last visited Aug. 31, 2010).

2007) or down (as it was in 2009) says little about the seriousness of Mr. Robbins' omission of the account from his tax returns, given that the relevant taxes were withheld. Nor does it say anything about the quantum of his taxable income, since the unrealized gains were not taxable.

> 2. A Sentence of Probation Adequately Reflects The Seriousness of the Offense

Mr. Robbins will have already paid, as required by his plea agreement, a massive combined financial penalty of over $21 million.[12] To our knowledge, this includes, by a wide margin, the largest FBAR penalty paid by any defendant in the UBS prosecutions. This penalty is harsh and it is punitive. It is predicated not on realized profits, but on the December 31, 2007 market value of securities in the UBS account -- market value that has since plummeted by more than 50%. In reality, Mr. Robbins has paid a fine consisting of more than 100% of the account's current assets, wiping out approximately 78% of his net worth. (PSR ¶ 63). This is not a situation in which a defendant is left with such abundant post-penalty assets that the payment of the fine does not truly "hurt." To the contrary, this fine wipes out decades of prudent investing and savings. It ends a dream of leaving the fruits of this investing to his grandchildren -- a dream he attempted to fulfill by leading a relatively modest life despite his ostensive accumulated offshore wealth.

Under these circumstances, a sentence of probation will still reflect the seriousness of the offense. *See Gall*, 552 U.S. at 48 (holding that a sentence of probation is punishment amounting to a "substantial restriction of freedom"). In short, the $20.8 million civil penalty, joined with a term of probation, amply reflects the seriousness of his offense.

---

[12] This includes the $20.83 million FBAR penalty, and $186,809 in state penalties.

C.    A Sentence of Probation Provides Adequate Deterrence and Protects the Public

Adequate deterrence and protection of the public are ensured by a sentence of probation. First, neither specific deterrence nor protection of the public is an issue here.[13]  Apart from this tax offense, Mr. Robbins has lived a law-abiding life.  General deterrence is also served by a sentence of probation.  Mr. Robbins has federal and state felony convictions.  His name and photograph have appeared in newspapers and on the internet, forever linking him to his crime. He will have paid over $21 million in penalties.  The Government emphasized the immense penalty in its press release because it recognized that the payment reflected the seriousness of the offense and sent a message of deterrence.  In light of these factors -- and the fact that he is being prosecuted at the age of 84 -- no one would rationally view a sentence of probation as indicating that tax crimes are lightly punished.  On the contrary, this case will deter future violators.

D.    A Sentence Of Probation Is Appropriately Imposed Under Section 3553(a)(3)

Section 3553(a)(3) urges the Court to take into account the fact that sentences other than imprisonment are available and often more appropriate.  Here, the Guidelines provide for a within-the-range sentence of probation with home detention.  Given Mr. Robbins' age and medical problems, the absence of any risk to the community, and the fact that he does not require the intense rehabilitation that imprisonment offers to some, probation is the appropriate sentence. Moreover, defendants in Mr. Robbins' position are not sentenced to incarceration in four out of every five cases.[14]  Nothing suggests that Mr. Robbins should be treated more harshly than

---

[13]   This conclusion is also supported by statistical evidence.  A Sentencing Commission study showed that defendants in his situation -- first-time offenders with no prior arrests -- only recidivate approximately 6.8% of the time.  *See* United States Sentencing Commission, *Recidivism and the "First-Offender"*, at 26 (May 2004), *available at* http://www.ussc.gov/publicat/Recidivism_FirstOffender.pdf (last visited Aug. 31, 2010).  Also, as discussed, defendants of Mr. Robbins' age and Criminal History Category present an exceedingly low risk of recidivism.

[14] According to the Sentencing Commission, approximately 80.8% of United States citizen defendants who were (i) in Zone B, (ii) in Criminal History Category I, and (iii) who received a within-the-range sentence were sentenced to an alternative to imprisonment – even *without* a downward variance.  *See* United States Sentencing

22

similarly situated defendants. Finally, we respectfully suggest that home detention is not necessary here for protection of the public, to deter Mr. Robbins from committing additional offenses or to reflect adequately the seriousness of the offense (in light of the other punishment).

      E.      A Sentence Of Probation Will Avoid The Creation Of Unwarranted Sentence Disparities Between Mr. Robbins And Other Defendants With Similar Records Who Have Been Found Guilty Of Similar Conduct

            1.      A Sentence Of Imprisonment Would Create Disparities With Other Defendants Who Have Been Sentenced In The Other UBS Taxpayer Cases

The Court should take into account the fact that the majority of the defendants who have been sentenced across the country for offenses related to offshore accounts at UBS have not been sentenced to any term of imprisonment. Given the sentences imposed in the other UBS-related prosecutions, a sentence of imprisonment here would cause an unwarranted disparity.

The initial UBS account holder convicted and sentenced for a tax offense was Igor Olenicoff, a billionaire Orange County real estate developer, who owed more than $52 million in back taxes, interest, and civil fraud penalties.[15] Despite inflicting a significant tax loss, the government accepted a guilty plea to a single count of filing a false return and recommended a sentence of three years' probation.[16] Unlike Mr. Robbins, Mr. Olenicoff was not required to pay an FBAR penalty of 50% of the holdings in his account. It is difficult to imagine a greater disparity in sentencing than if Mr. Robbins, who caused no tax loss, is sentenced to prison.

Several other UBS defendants have also received sentences of probation:

---

Commission, *Alternative Sentencing in the Federal Criminal Justice System*, at 14 (Jan. 2009), *available at* http://www.ussc.gov/general/20090206_Alternatives.pdf (last visited Aug. 31, 2010).

[15] *See* IRS Release, *Real Estate Developer Igor Olenicoff Pleads Guilty To Filing A False Tax Return and Fails to Disclose Foreign Bank Accounts to IRS* (Dec. 12, 2007), *available at* http://www.irs.gov/newsroom/article/0,,id=212163,00.html (last visited Aug. 31, 2010). News reports state that Olenicoff was worth approximately $1.6 billion at his sentencing. *See* Janet Novack, *U.S. Agrees Guilty Billionaire Shouldn't Go To Jail, Forbes.com* (Apr. 2, 2008), http://www.forbes.com/2008/04/02/taxes-irs-olenicoff-biz-billies-cx_jn_0402olenicoff.html (last visited Aug. 31, 2010).

[16] Government's Sentencing Brief, *United States v. Olenicoff*, No. SA CR 07-227-CJC, at 3 (Apr. 14, 2008).

23

- *Steven Rubinstein* (09 Cr. 60166, S.D. Fla): Sentenced to three years' probation, with one year of home detention. Faced a Guidelines range of 18 to 24 months' imprisonment.

- *John McCarthy* (09 Cr. 784, C.D. Cal.): Sentenced to three years' probation, with six months' home detention. Faced a Guidelines range of 24 to 30 months' imprisonment, with tax loss of $200,000 to $400,000.

- *Juergen Homann* (09 Cr. 724, D.N.J.): Sentenced to five years' probation and a $60,000 fine. Faced a Guidelines range of 30 to 37 months' imprisonment, with tax loss of $400,000 to $1 million.

- *Roberto Cittadini* (09 Cr. 344, W.D. Wash.): Sentenced to three years' probation, with one year of home detention. Faced a Guidelines range of 10 to 16 months' imprisonment, with tax loss of $12,500 to $30,000.

- *Paul Zabczuk* (10 Cr. 60112, S.D. Fla): Sentenced to three years' probation, with one year of home detention. Faced a Guidelines range of 24 to 30 months' imprisonment with tax loss of $200,000 to $400,000.

Three other UBS defendants of whom we are aware have received prison sentences of one month, two months, and ten months.[17] In the case involving a ten-month sentence (apparently the longest sentence imposed thus far in any UBS case) the defendant, Jack Barouh, acknowledged causing a tax loss of between $400,000 and $1 million, leading to a Guidelines range of 30 to 37 months' imprisonment. No UBS defendant was made to pay a $20.8 million civil penalty, as Mr. Robbins has paid. Nor were they otherwise similarly situated to Mr. Robbins, who caused no tax loss, is a combat veteran, and is 84 years' old.[18]

---

[17] The defendants in these cases are Jeffrey Chernick (09 Cr. 60182, S.D. Fla), Robert Moran (09 Cr. 60089, S.D. Fla), and Jack Barouh (10 Cr. 20034, S.D. Fla). Barouh is discussed in the text. Moran (two months) caused a tax loss of $25,788 and faced a Guidelines range of 10 to 16 months. Chernick (one month) faced a Guidelines range of 18 to 24 months. No UBS defendant in Mr. Robbins' Guidelines range has been sentenced to any imprisonment.

[18] Although these other defendants (except for Olenicoff) provided cooperation recognized by the government, as far as we can tell, no defendant provided information used to prosecute another defendant residing within the United States or testified in a trial. Their cooperation primarily related to the deterrence benefits provided by a timely plea. Mr. Robbins' timely plea, large civil penalty payment and other cooperative steps have provided analogous benefits.

2.      Sentencing Mr. Robbins To A Term Of Imprisonment Would Create
        Unwarranted Disparities With Other Tax Cases

The imposition of a term of imprisonment here also would create unwarranted disparities
given that most defendants in tax cases are receiving significant downward variances. A
sentence below the applicable Guidelines range is commonplace in tax cases. Only 37.7% of the
621 defendants sentenced for federal tax offenses during Fiscal Year 2009 received a Guidelines
sentence.[19] Tax defendants who received downward variances under Section 3553(a) saw a
significant reduction from the low-end of their Guidelines range: a median decrease of 10
months, amounting to a 72.8% median percentage decrease in sentence length.[20] A Guidelines
sentence here would cut against the grain of national sentencing practice in tax cases.

Finally, recent decisional law further confirms that courts are granting downward
variances and imposing probationary sentences in tax cases with increasing frequency. *See, e.g.,
United States v. Tomko*, 562 F.3d 558, 573-75 (3d Cir. 2009) (en banc) (affirming variance from
12 to 18 months to probation despite prior conviction and tax loss of $228,557); *United States v.
Gardellini*, 545 F.3d 1089, 1091-95 (D.C. Cir. 2008) (affirming variance from 10 to 16 months
to probation; defendant caused tax loss of $94,000, but "accepted responsibility," "posed no risk
of recidivism," and had "suffered substantially due to the criminal investigation"); *United States
v. Pflum*, 556 F. Supp. 2d 1254, 1263-64 (D. Kan. 2008) (granting variance from 12 to 18
months to probation partly due to post-offense efforts at compliance with tax laws; tax loss was
$195,848).

---

[19] *See* United States Sentencing Commission, *Sourcebook of Federal Sentencing Statistics* ("*Sourcebook*"), at Table 27, *available at* http://www.ussc.gov/ANNRPT/2009/Table27.pdf (last visited Aug. 31, 2010). By comparison, 56.8% of defendants nationally were sentenced within the Guidelines range. *See* United States Sentencing Commission, *Statistical Information Packet, Fiscal Year 2009, Southern District of New York*, Table 8, at 11, *available at* http://www.ussc.gov/JUDPACK/2009/nys09.pdf (last visited Aug. 31, 2010). In other words, a tax defendant was far more likely to receive a non-Guidelines sentence than was the average defendant. *Id.*

[20] *See Sourcebook*, Table 31C, *available at* http://www.ussc.gov/ANNRPT/2009/Table31c.pdf (last visited Aug. 31, 2010).

## CONCLUSION

For the foregoing reasons, we respectfully ask the Court to sentence Mr. Robbins to probation, without imprisonment or home detention, as recommended by the Probation Office, and to impose no additional financial penalty.

Dated: New York, New York
September 2, 2010

SCHULTE ROTH & ZABEL LLP

By: _____
Martin L. Perschetz
Harry Sandick
919 Third Avenue
New York, New York 10022
(212) 756-2000

*Attorneys for Defendant Jules Robbins*

# EXHIBIT 1

June 1, 2010

Judge Richard J. Holwell
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, N.Y.   10007

Dear Judge Holwell:

My name is Linda Robbins, I am Jules Robbins daughter, a hard letter to write, actually I
have been trying to write this letter for days, I start to type and get carried off on another
tangent, sometimes so hard to write I start to cry, as you need to know and understand the
man my Dad is....But will try one last time. I decided this will be more like a letter of
"Brief Stories" to try to explain the man I KNOW and who has been there for me,
everyday of my life.

You need to understand the true man my father is.  My Dad started his business with a
partner,  I remember he use to tell us stories how he tried to work for some company,
begging them for a job to sell, and they said if he would type invoices, they would let him
sell a couple of days a week.  He use to type invoices so fast so he could sell, and he did.
My Dad did so well in sales that the man working there, one day asked him if he wanted
to start his own business, My Dad would sell and he would buy the watches.  They had a
partnership until my Dads partner of over 30 years passed away.  This is how Webster
Watch started.  I remember the respect and relationship these two men had, and it is a
very special and rare thing to behold.  I only say this, as to understand how my Father
had a great respect of people and people had a great respect for my Dad.  He was one of
the few men, to this very day, that I know (and believe)  would shake your hand or say he
will do something, and you could count on it!  One of the many life lessons my Father
has taught me.  When you say something and make a promise, there is no going back,
otherwise best not to say you will do it!  My Dad taught me character and strength thru
his actions of how he handled his business and people.

While I was growing up, I remember my Dad always wanting to be around his family, in
the summer he would grow vegetables in a little patch in our backyard, and teach us all
how to garden.  Every Sunday, he would wake us up SO early, I remember he use to
come into my bedroom and say " Rise and Shine, It is a Beautiful Day, everyone get up",
we use to all jump in the car and go on our Sunday Routine, always ending with us going
to the bakery so we could pick up our Cupcakes for dessert on those Special Sundays.
My father is and always was a very family oriented man, and a devoted husband.  We
would always go take a drive to my cousins house in Plainview, or my grandparents
would come and visit, whether there was a little league game that my father would take
my brothers to, or just take us all to the beach, we would always be together, as that was
his joy, his family all together, doing the simple things all together.  Even at meal times, I
still remember (and we joke about it now) when we were all sitting together eating

dinner, my father would always say, "isn't it nice we are all sitting together having dinner"!   Funny how you take these things for granted, but to this day, my Dad will come over on Sunday nights to our apartment and we would have dinner, and I would think to myself, "isn't it nice we are all together", something I have learned to cherish (especially now living in the city and seeing how many families do not eat with their children) I have learned that no matter what, if you can sit with your family and eat together, you develop a bond that never ever fades, and our son, now 16 years old, we have dinner together at the table, something I have learned from my Dad, something that keeps the family intact and together.  I am sure that a Sunday dinner would never be the same without my Dad present!

Sadly my Mom Passed away 9 years ago, however the man my Dad was, he took care of my mom all by himself. There were times when my Mom was so sick, my Dad would never complain, he would care of my Mom day in and Day out, cause she wanted to die at home and not in a hospital.  It came to a point, that we just insisted on my Dad getting some help with my mom, and just arranged for it.  My father NEVER left my mothers side, and to this day, every Sunday my Dad has his routine,  he visits with my Aunt for lunch (his only sister) he goes and visits my mom in the cemetery, and then on a lot of Sundays, my Dad comes to our apt for dinner, (again those Sunday dinners, that started when I was a child)....the point being made is the love my Dad always has for his family still, which now consists of his 3 children and grandchildren.  He is really my son's only living grandparent, my son always had only my Dad at Grandparents Day, I am not sure what my son's life would be like without ever knowing what a Grandpa was, (my husband is from Bulgaria, so we never met his parents)  and my son sees a strong,  84 year old man, a man he enjoys to listen to stories with while we are all together, a man he can look up to. My son was the biggest joy to both my parents when he was born, they were constantly with us, constantly spending weekends together, walking in the park, letting them babysit while my husband and I grabbed a bite out, again just the most important thing I think growing up with my Dad was how much his family meant to him, and being with them was his life!

I remember growing up, perhaps you can say I was a little bit of a "rebel", but I always had my Dad to talk too, he was never too busy to sit with his kids. I was always very close to my Dad (being the oldest and only daughter) that there were times perhaps looking back, things that most girls would discuss with their Mom, I guess I always talked to my Dad. He always had such a positive attitude toward life (maybe because of how he always strived to do his best, no matter what the obstacles he would always keep moving forward) My Dad was and still is a kind and patient man. He has a heart of gold. Growing up, I always remember hearing, "you can always count on Julie", and even learned of times when my Dad (who was just starting out in business himself) , and we moved from a one bedroom (it was just one brother and myself back then) garden apartment in Kew Gardens to our home that is still to this day our home in Jericho, and while making friends and a life, my parents developed a very very close bond with their friends Janet and Lenny . Jericho was a small town, two feet and you were on your neighbors lawn, and I grew up with their daughter. She tells me to this day how my Dad, struggling himself starting out in business,  lent her parents money, never expecting it

back, but he did it to help his friends. Amazingly over 40 years later, when the couple sold their house, they paid my Dad back. These are stories when I hear that never surprise me, because that was my Dad. Always dependable, always gives you a fair shake, but most important always gives his best from his heart.

My husband is from Bulgaria, so my Dad is the only GrandPa my son ever knew. My Dad has shown my son many of the qualities that I was taught by him. I remember my Dad, I must have been 16 or 17 and soon heading off to college, and he sat me down and taught me how to write a check, keep a checkbook. He said to me, I should always know what is going on, make sure I know how to handle things on my own, and always try to have a positive attitude. There have been many times in my life, growing up, that there were periods I was a little "lost". When I was 21 years old I left college, and my Dad found a job for me in his small business, I would type invoices. (even though I couldn't type a word), he saw I needed help and he gave me the opportunity. I stumbled a few times, and my father always would instill upon me my moral obligations, he never gave up on me, he was always my rock, and to this day, my Dad is still the one "rock" that I can count on, can lean on, someone that will always listen to me. I have worked with my Dad, traveled with my Dad for over 35 years, since that is how long I have worked with my Dad in business. We have a very special bond, and I am proud to be his daughter, as again I think my Dad has the highest moral character, something I think I got from him, and I am proud of it, proud to be my Fathers Daughter!

Just so you understand my Dad, he was a man of modest beings. I guess growing up in the depression, getting called into the military when he was 18 (I remember my grandma telling me stories how my Dad wanted to go to Cornell or some college, and that the only way he could afford it was to sign up with the Army and they would pay for his college, however the war broke out, and my Dad was called overseas when he was 18 or 19 years old. My Grandmother was besides herself, but he went off to war, and I remember him not wanting to talk about it much. But when we were little we use to try on his hats and he had an old army jacket (said all the rest had to be burned cause of lice!) and we saw some black and white photos of my Dad when he was in the army.. My Dad didn't talk about it much I guess cause parts of course were very painful and then also because my Father was never one to brag, to boost, to call attention to himself. I think this is one of the many life lessons I have learned from my Dad. Learn to live your own life, do the best you can and hold your head high. I looked up to my father, and to this day I still do, because of working with him in business since I was 21 (we still work together) I have seen my Dad almost every day of my life. I have traveled with my Dad on business trips, and I still will never forget how my Dad taught me how to be. He always made sure to say Please and thank you, always told me to be nice and smile at everyone, (I still remember when we use to call on Kmart),I traveled with my Dad (after many years of typing and learning the business from the bottom up), cause that is how my Dad believed you should learn, that is the way he made his way, and that is how he taught me to try and achieve, he never handed us anything, it was always hard work will get you where you want to be. He would tell me oneday when I was frustrated, if you make 100 sales calls and get one positive reply, then you have achieved something. My father has made me what I am today. I believe sometimes my standards are way high, as in life I have only

seen my father do everything by the book. He would vote in every election, say it was his duty to his country and taught us this is just something you do. My Dad worked his entire life, and if he wasn't working, he was at home with his family.

I have seen my father over the last year or so, suffering, not sleeping, thinking how he made such a mistake, regretting and feeling sorry for what he has done. He has told me that if he knew any better he would have acted in a different manner, he is truly sorry and has suffered immensely. Funny but what I think hurts my Dad the most with his problems, is that he will be considered a criminal. A man that his whole life tried to do what was right, worked hard, lived a modest life, taught his children to be truthful and honest, and to have this on your shoulders and know that toward the end of your life, this is how it ends up. He is truly sorry, I have seen my Dad tear up to me saying how regretful and sorry he is. I beg the court to understand the man, and see how he has suffered in anguish the last year or so, and to know that he truly is sorry for what he has done.      I also beg Your Honor to not take my Dad out of our lives, I guess now, no matter what age you are, you always need your Dad, and I truly need my Dad. Still he gives me strength, he makes me think positive when I feel the world is collapsing, he teaches me to hold my head up high, and he is greatly loved by his family. He is my Dad, I will always look up to him, and still think he is one of the most respectful honorable men you could know.

I guess I need to stop, or I will write a book, this is all my own words (little rambling sometimes, too bad we can't speak in person, but I know that is not allowed) and I am not the best at writing, but I hope you understand that the man (I don't look anymore) who was written about in the paper is so far from the real man my Dad is. Again I beg you to let him live the rest of his life with his family, he has suffered in his mind about how he realizes the wrong of all of this, but as in any circumstance, my Father handles this with dignity and strength and still tries to take care of his family anyway he can.

Thank you Judge Howell for listening to me, not sure if this is what I am suppose to write, but I just felt I must tell you about my Dad, and not to think of him as everyone else. There is truly not many men on this planet that could compare to the man I have honored, respected and who has taught me what it is truly like to be a true, honest, loving, and kind individual that would help someone when in need, even if it meant denying himself of something.      Kindest regards Linda

*Linda Dobbins*

*R - made some typo's + I corrected them*

# EXHIBIT 2

90 West Broadway
New York, New York 10007

June 4th, 2010

Judge Richard J. Holwell
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007

Dear Judge Holwell:

My name is Steven Robbins. I am the first born son of Jules Robbins, who you will be
sentencing this summer. I am writing to provide you with my perspective of a man
whose remaining years will be profoundly and irreversibly dictated by your decision. As
a judge you make decisions every day; some so obviously clear because of the facts
and circumstances surrounding a case, and some, agonizing, as ambiguities and
opaque evidence obscures the truth. I sincerely trust that my letter to you will make
your decision an easy one, and that, as such, the man whose fate rests in your hands
will be forever changed in a way so that his future actions and sensitivity towards others
creates inspiration, fulfillment, and love.

My father grew up during the Great Depression, the son of Jewish immigrants from
Eastern Europe who came to this country to escape persecution and seek a better life.
My grandparents worked in sweatshops on the lower east side and saved every penny
to buy a house in Brooklyn. My father was the eldest child (he has a sister seven years
younger) and as such, took the role model of the stoic protector of his parents who
hardly spoke English as well as his younger sister. He buried himself in books,
especially those related to Math and Science, and had dreams of being a chemist.
World War II dominated his high school years, and like every red blooded male of that
generation he jumped at the first chance he could to enlist in the Army. He was
seventeen, and the GI bill provided a free college education for those who committed to
serve their country. He drove a tank, fought in the European Theatre, and came home
to Brooklyn as a proud soldier in a uniform laden with medals.

College beckoned, and so my father enrolled at Brooklyn College, and majored in
Chemistry. Summers were spent earning money as a waiter in a circuit of hotels up in
the Catskill and Adirondack Mountains. He met my mother during one of those
summers – she, a vivacious, energetic lead dancer in the headline show, and he, a tall,
handsome, still stoic, hard working, waiter. They married, this contrasting pair, and
began a life together. My father, having graduated college with a degree in Chemistry
tried his best at finding suitable work in his field of study. He was born Rabinowitz and in
the early 50's, he already had a strike against him with such a name. So he changed it
to Robbins, but still could not find work paying a decent wage. By happenstance, he
met someone in the watch importing business, worked a few years for others, and then

started a firm called Webster Watch Company with a partner in 1954, the year my older sister was born.

Those beginning years were tough. My father was on the road almost all of the time, while my mother, like most women of her generation, gave up a promising career as a dancer, and raised a family. I was born in 1956, and in 1960 we moved from a cramped apartment in Queens to a newly built house in a development built on former potato fields. I still remember my first visit to this house. It sat on a quarter acre plot surrounded by nothing but dirt and a driveway. My father seeded the soil, grew grass, planted shrubbery, and created a vegetable garden in the backyard. My father was away a lot in those years, peddling, yes, peddling watches as was mentioned in the recent news articles about him. The Daily News and others portrayed him as a "high end" watch peddler. However, Judge, I must make it clear to you that the product my father peddled, nor he himself, was reminiscent of anything you would find in a Neiman Marcus catalog. My father sold what was known as low end discount watches – you could find them in Kmart or Family Dollar. They were the watches that a working class family would buy - $10 bucks at retail at best. My father's frugality mirrored the product he sold. He is not a lavish man and never spent as one. We would go to Syms to find discount suits. He wore unstylish brown short sleeved shirts to the office. He used a shopping bag as a briefcase. The house I grew up in he still resides in, and he still tends to the vegetable garden in the backyard.

I was fortunate enough to grow up in a neighborhood with good schools and little crime. I was able to get a great education and participate in high school sports. I went on to college and graduate school, and found a career that I still enjoy in the financial services industry. My father encouraged me always and gave me the freedom to make my own choices. The values I grew up with, I continue to hold dear. I live by the Golden Rule both in my personal and business life. I am blessed with a one-of-a kind wife of 29 years and an accomplished and wise for her age daughter who is now 21.

The business my father built took its toll over the years. By now, Judge, you may be getting the picture of a man who kept his emotions inside. He was never a "touchy, feely" sort of a man. He developed a serious ulcer when I was 13 and in his 50's had an almost fatal heart attack which slowed him down. My mother, just the opposite of my father in temperament, was a fun loving, "carpe diem" of a woman,. She had breast cancer, beat it and then succumbed to its ravages in 2000. My father recently had his hip replaced, but somehow developed a serious stomach ailment after surgery, and then spent almost a month in the hospital. Seeing him laying motionless in the hospital a few years ago, I certainly thought he was a goner. But he came back. Physically he seems ok today.

Mentally he has suffered.  Certainly the loss of my mother had a devastating affect on my father and my family – an effect that he would only know after she was gone.  The "curse" of this Swiss account and I do call it a curse, has caused great upheaval in my father's life with no visible or material benefit, from what I can see.  As I mentioned, Judge, we lived a very middle-class life - no flashy jewelry, no exotic vacations. My father worked hard and did the absolute best he could for those around him.  For the past few years, while knowing there was trouble brewing and an investigation imminent, my father worried.  He sleeps fitfully, if at all.  I truly believe he has already served a sentence far worse and prolonged than many criminals.  He has served the sentence of a man that has been racked with guilt and uncertainty for years.  To take him away from those that care for him and love him would do no good to society or to him.  My father, even though he is 83 years old, still has a lot to learn and to give.  I respectfully ask you to allow him the freedom to do so.  Thank you, Judge, for allowing me to give you a little bit of history and background as well as my own perspective on my father as you consider his sentence.

Sincerely

*Steven Robbins*

Steven Robbins

# EXHIBIT 3

**David Robbins**
**144 West 86th Street, Apt 5C**
**New York, NY 10024**

June 3, 2010

Judge Richard J.Holwell
United States District Court
South District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007

Dear Judge Holwell,

I am writing this letter to tell you a little about my Dad, Jules Robbins, our relationship and his character. I know he will be sentenced this July, and I hope you take my words and feelings into consideration when making your final ruling.

My early memories with my Dad are little league baseball. He would always take me to my games and root me on. I was a pitcher, and he was always behind the back stop. It always made me feel proud and confident to have him there. Afterwards, as a treat, we usually went to McDonalds. We always made a guess before we arrived at how many" billion" hamburgers the McDonald sign would say. At lunch, we would talk about the game. I always looked forward to this time with just my Dad. It was very special to me.

Another early memory was going to work on Saturdays with him on the train. We lived on Long Island and would take the train to the city. It all seemed very exciting. He would set me up at the office with some work. Then in the early afternoon, we would get some lunch together and then head back on the train.

Growing up, my Dad was always there for me and very supportive of any endeavor I did. We would build model rockets together, he would help me with my homework, and always take me wherever I needed to go. We also played a lot of sports together. One of those sports was handball. My Dad was originally from Brooklyn and was very good in high school playing on the handball team. Often on weekends, he would take me to my high school to play handball. I never beat him. The last game we played together was very close. My Dad had a heart attack soon after and was not able to play anymore since he could not exert himself too much.

After college, I joined him in the watch business and started from the bottom. He took me with him to Hong Kong to meet with the factories to learn the ropes. All the vendors we met always told me how nice it was to deal with my Dad and I was lucky to be apart of his business. My Dad has a very good reputation and was well respected by everyone I met.

1

**David Robbins**
**144 West 86th Street, Apt 5C**
**New York, NY 10024**

Today, my Dad is very involved and an integral part of his grandchildren's lives. We all have weekly dinners together, and he babysits for our two younger ones. They always love when Grandpa comes over since they know they will play games with him and maybe get to watch a movie.

Besides being an integral part of the grandchildren's lives', he is still very important and needed on a daily basis for the watch business my sister and I are involved with. His years of experience and knowledge help guide us in a positive way. We often go to him for advice in many situations.

I truly love my father and am so thankful for his nurturing and guidance in life. He is a good soul. It hurts me to see him in so much distress over the past year. I do know he has not had a full night sleep since the investigation started and I can see it has taken a toll on his health. I also know he deeply regrets his actions and also fully accepts all that has come to him. I hope you take all of this into consideration when making your final ruling.

Thank you for taking the time to get to know my Dad a little better from my words.

Sincerely,

David Robbins

# EXHIBIT 4

May 29 2010
36 Woodland Dr.
Roslyn N.Y 11576

Dear Judge Holwell,

My name is Nancy Landau. I am the only sibling of Jules Robbins—

We grew up in the Brownsville Section of B'klyn— Our immigrant parents were hard working, in the garment industry, and family centered— During the depression my father walked from Brooklyn to Manhatten and back looking for a job— They were proud people and never asked for help—

Jules, 7 years my senior, was like a 2nd father to me. He taught me to write script, protected me when I was chased home from school and taught me to dance— He was the one who started school with his name on a sign around his neck and not speaking a word of English— I started school speaking english because of him.

Jules entered B'klyn College after the and W.W. started at the age of 16— I remember clearly how because he wanted to help

win the war, at his 17th birthday he campaigned continuously until he wore our parents down - His argument was that he would have a free college education if he enlisted in the army - Very shortly after he turned 18 he was sent overseas and served over 2 yrs - My mothers Dr advised her to get a job if she didn't want to have a nervous breakdown -

Jules after marriage, started working for a small watch company just for commission He was such a hard worker he became a partner - Two of his three children were taken into the firm - He helped his other child with his choice of profession - When his wife became ill with cancer he devoted himself selflessly to taking care of her - He has been a caring and devoted son, husband, father and brother -

Jules has been a good person who has never turned away from any one who needed help - His family and friends have been enriched with his prescence -

I am relying on your compassion in this matter -

Thank you
Sincerely
Nancy Landau

# EXHIBIT 5

**Dorothy Lee Schimel**
**39 Gramercy Park North, Apt. 9A**
**New York, NY 10010-6306**

**June 2, 2010**

Judge Richard J. Holwell
United States District Court
Sothern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Holwell:

I am an 85-year old woman who was widowed at age 39 and earned my living in the small leather accessories business. I have many friends because I truly understand that friendships are the currency of my life. There is no friend I value more than Jules Robbins.

It has been my great pleasure to know Jules Robbins for over 40 years. This letter is submitted in support of him in advance of his sentencing this summer.

Jules and I met in the 1960s when I first started my sales career during the Accessories Market Week in Chicago. We were in similar product fields. He saw me struggling in an area new to me, where he had an established market. He introduced me to others whom he knew could help me succeed. He showed me sales techniques and product displays that were invaluable to me. I had nothing but my gratitude to offer him. When I returned to New York City he encouraged me store my heavy and bulky sample cases in his Manhattan office overnight each day so that I did not have to struggle with their size and weight every morning on the bus from Brooklyn.

He introduced me to his wife and children...and to his business partner and his family. He referred me to his investment broker at Merrill Lynch so that I could begin a savings plan in mutual funds, which, to this day, has been a large part of my financial security.

I was so impressed with his lifelong and abiding love for his wife, Cecil. They had met in the Catskills as 20-year olds and shared a mutual love and delight in professional dancing. Her death in 2000 nearly destroyed him. To this day he preserves everything in his home that she purchased and arranged; just as she left it...her voice still answers his cell phone.

In 1995, I was forced into retirement by my employer. I was at that time president of my division. I was bereft at losing the atmosphere of sales and people and market news that had filled my days. Jules Robbins not only saw this but was determined to help. He announced at my 70th birthday party that there would be a desk and phone for me

Page 2
Letter to Judge Holwell
June 2, 2010

me as long as he had an office in Manhattan. I went there for a few hours almost daily
for the last 14 years until he had to give up the office last year. He even arranged to put
my name in the lobby directory, so that my old friends could find me to visit and
exchange market news. It meant everything in the world to me.

In 2000, I experienced a pulmonary embolism and woke up to find Julie standing by my
bedside in the emergency room. He called my sister in Florida to reassure her that I was
okay and in good hands. His daughter Linda and his son David were there, too. Julie has
always shared his children and grandchildren with me--they are like my own. His
grandchildren all come on holidays and special birthdays to celebrate, play games and
cookout in his original home in Jericho where he raised his family.

Two years ago, I suffered a terribly incapacitating illness which confined me to my home
for many months. He often walked from his office or his apartment in the 70s after work
to my apartment on 21st Street to make sure I had everything I needed to make a complete
recovery.

I am grateful for this opportunity to testify to the enduring human qualities of this man,
who truly deserves your mercy and understanding during these terribly sad days.

Sincerely yours,

# EXHIBIT 6

Judge Richard J. Holwell
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007


7 June 2010

Dear Judge Holwell,

I have been sitting here trying to think of the words to use to express to you who Jules
Robbins is and the impact he has had on me and my family for so many years. I need you
to know how much this man means to me and how he has been an ongoing source of love
and support to us.

I was only nine years old (1963) when I first met Jules and his wife Cecil. My family had
just moved from the only home I had ever known in the Bronx and I remember feeling
nervous and uncertain. Jules Robbins was our neighbor. He befriended my parents and the
four of them became close friends. I was introduced to his children and his daughter and I
are friends to this day. I remember always feeling welcomed and comfortable in his home.
He was always friendly, warm, and genuine – children sense when someone is being
truthful and he certainly was.

As the years and decades passed the family friendship never wavered, in fact, it grew
stronger and closer.

In the 1990's my father became ill, and as a result of this his business was doing poorly. My
parents found themselves in dire straits. It wasn't until several years that I found out that
Jules, quietly and without fanfare, gave my parents money to keep them from losing their
home. My father was quite ill by then. Jules would come over all of the time and check on
him or just sit with him and visit and talk and make my father smile and laugh – precious
moments I will always hold in my heart. Jules never asked for anything in return. He never
asked for thanks. He is truly a man with a heart – a man who cares and does what he does
because he knows it is the right thing to do.

After my father died in 2004 Jules made sure my mother was always doing okay. He would
stop by and call and continually check in with her. When my mother moved to Florida a
few years ago Jules continued to call her, at least once a week, to make sure she was okay
and to see if she needed anything. Whenever he goes to Florida he also makes sure to go
visit her and take her for something to eat.

When my mother could no longer afford to keep her car and had to give it up, it was Jules
who – without hesitation – GAVE her his car that he kept in Florida so that my mother
would have dignity and independence.

I cannot say enough about this wonderful man who takes care of so many without expecting anything in return. Because of him my father smiled although he was dying. Because of him my mother knows she has a friend out there who she can turn to in times of need. Because of him I can relax that my mother is being watched over by someone other than me.

There are too few men of such character and heart. Jules Robbins is truly a good man. He is someone who I have loved since I have been a little girl. He is someone I know I can personally turn to in need of someone to turn to – he is the closest I have to a father now that my father is gone.

I now have grown children and they, too, are close with Jules. They have wonderful memories of Jules and their grandfather. They also know they can turn to him if they need to.

This man has made quite an impression on our lives.
We love him.

Sincerely,

Bobbie Jodre
601 W. 57ᵗʰ Street
Apt. 16B
New York, NY 10019
bobbiejodre@gmail.com

# EXHIBIT 7

Judge Richard J. Holwell
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007

Dear Judge Holwell,

I am submitting this letter in advance of your sentencing Mr. Jules Robbins and hope you will take into account the true character of the man and not just this isolated incident.

I have known Jules Robbins and have had the pleasure of working with him since 1964 and we have been friends virtually all of these years. Our families have been close over the years and we have watched each other's children grow up.

Until his wife passed away in 2000, the four of us had dinner together frequently and at times travelled together. He also took personal care of this wife throughout her illness, which lasted several years. After his wife passed, we still have dinner once a week, when we are in New York and even though he is one person and we are two, he insists on splitting the check. While this in itself is not big, in my opinion, it shows character.

He spends a great deal of time with his children and grandchildren and shows great pleasure in doing this. In 2002, I had surgery and he visited me in the hospital and called my wife to make sure she was okay.

When friends are in need he shows compassion and in Florida gave a car he was no longer using to a friend who needed a car, but had no money to purchase one.

A major reason for my own personal success came about due to the relationship, guidance and help of Mr. Robbins. This permitted us, my wife and I, to be able to financially allow our son to go to college (CAL-TECH) in CA, work for the state of CA on their Air Resources Board and finally start (with a partner) an environmental consulting business which advises companies how to obtain permits and conform to the laws as required.

Any consideration you may give to Mr. Robbins would be very much appreciated.

Sincerely yours,

Lester E. Rubenstein
333 E. 69th Street  Apt: 10A
New York, NY 10021
212 535-6660

# EXHIBIT 8

*Lawrence H. David*

June 4, 2010

Judge Richard J. Howell
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

Dear Judge Howell:

I have had the privilege of knowing Jules Robbins since 1973. We met through a family member and I even worked for Jules in 1974 in the watch business.

I have since moved on to the investment banking business. But during all these years, we have managed to keep a close friendship. Jules became like a father to me- always concerned about how I was doing. He was always there to lend a helping hand, especially in times of stock market turmoil. It was a good feeling to know he was in my corner and someone I could count on at all times.

When his wife Cecil was so ill and required his undivided attention, he still found time to check up on me. His devotion to his late wife Cecil was unprecedented. As sick as she was he undoubtedly added years to her life. Jules has three children and many grand-children. He has demonstrated his compassion for his children all through the years. His Memorial Day BBQ's are an annual event and watching him with all the children is a pleasure. He is the ultimate "parent and grandparent" in all ways.

The thought of Jules not being with his children and grandchildren is more than he can bear. These kids are his life now that his beloved wife is gone. I hope and pray that he will be able to spend many more years with them. It's all he has.

Yours truly,

Lawrence H. David

*125 Broad Street, New York, NY 10004*
*Tel.: (212) 859-9293 · Fax.: (212) 859-9577 · (800) 443-6079*

# EXHIBIT 9

June 4, 2010

Judge Richard J. Holwell
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

Dear Judge Holwell:

I am writing this letter with regard to Jules Robbins whom I have known since 1963. He was the first friendly person my family met when we moved into a new neighborhood and knew no one.

In the many years of our friendship no one has proven to be a more warm, honest, trustworthy and devoted friend. Mr. Robbins always put others before himself and was there for anyone in need of help.

When my husband took sick and there was no one available all I had to do was call Jules and he was right there.

He visited my husband in the nursing facility every week to make sure he was well cared for. This was for a period of 6 years and it was never too much trouble.

When my husband passed away and I was in financial difficulty, it was Jules Robbins who was there to help me. When I was forced to give up my car because I could no longer afford it, it was Jules Robbins who gave me a car so that I could feel independent.

I have only known this man to be a most compassionate and caring person who would never do anyone any harm. I would trust him with my life.

There aren't enough adjectives to describe what an unusual man Jules Robbins is. You would have to have the good luck to know him personally to fine out.

I do not know what else I could say to anyone except that my life has been blessed by having the privilege of knowing and having a friend that I trust and can call at any time without hesitation.

Most sincerely,

Janet Samuels

2029 Lincoln B
Boca Raton, Fl. 33434

561-483-1156

# EXHIBIT 10

## ROY A. PIZZARELLO, M.D.

### NORTH SHORE UNIVERSITY HOSPITAL
300 COMMUNITY DRIVE
MANHASSET, NEW YORK 11030

DEPARTMENT OF MEDICINE
DIVISION OF CARDIOLOGY

PHONE 516-562-4100

November 20, 1980

Re: Jules Robbins

Mr. Robbins had his repeat stress test on 10/30/80 and it was abnormal, in that he developed 2mm horizontal ST depressions and chest pain, at stage II of the Bruce Protocol and at a heart rate of approximately 102 beats per minute . This test was performed on Propranolol 20mg q6h.  Because of the abnormal response, at a low work load, he was admitted for a cardiac catheterization, which he had on November 13, 1980.  At catheterization, we were able to document the presence of mild left ventricular dysfunction and very severe occlusive coronary disease, involving mainly his LAD, a large first diagonal and two obtuse marginal branches. His right coronary artery was ectatic, but free of any areas of significant narrowing.

I have discussed the results of these tests with Mr. Robbins and his wife and have recommended a surgical approach to his problem, on the basis of his symptomatology, abnormal exercise tolerance, at a low work load and the presence of significant coronary occlusive disease, that is technically suitable for bypass.  I have explained to him that there is no definitive data, on which to base a absolute recommendation, but that on the basis of the factors listed above, combined with the fact that he would like to resume a normal, active life, that I would feel his quality of life and very possibly, his longevity, may be improved with bypass surgery.  He stated that he would prefer medical therapy, for the time being and possibly getting into an exercise rehabilatation program.  I have recommended some programs to him and he is to start in the near future.  I have also asked him to increase his Inderal to 40mg QID and Nitroglycerine on a PRN basis.  He is to see me in approximately one week to have his stitch removed.

Sincerely,

Roy A. Pizzarello, M.D.
RAP/pcv

# EXHIBIT 11

NORTH SHORE UNIVERSITY HOSPITAL

MANHASSET, N. Y. 11030

CLINICAL ABSTRACT

THIS IS A CONFIDENTIAL AND PRIVILEGED COMMUNICATION

| NAME | | AGE | | SEX |
|---|---|---|---|---|
| UNIT NO. Robbins, Jules | | | | |
| 261379 | | | ROOM | |
| ATTENDING | | | | |
| ADMITTED Dr. Pizzarello DISCHARGED | | | | |
| 9/15/80   9/26/80 | | | | |

PRESENT ILLNESS: The patient is an active 54 year old male who jogs frequently and who was well until 3 days prior to admission when he experienced tightness in the chest and dyspnea while running.

This episode resolved in ½ hour. Over the following two days he noted decreased exercise tolerance and fatigue on walking severalblocks. On the day immediately prior to admission he was quite tired all day and remained in bed.

At 3 AM the morning of admission he was awakened from sleep by severe precordial discomfort of a pressing nature associated with diaphoresis, dyspnea and numbness along the medial aspect of the left arm.

The pain lasted several hours until the patient received oxygen and Morphine in the E.R.

PHYSICAL EXAMINATION: The patient's vital signs were normal and physical examination was essentially within normal limits except for an S4 gallop. There were no signs of CHF.

LAB DATA: Within normal limits. EKG showed NSR and changes consistent with anteroseptal ischemia vs infarction.

HOSPITAL COURSE: The patient was hospitalized in the CCU and he had no further pain but he had EKG and changes consistent with anteriolateral MI.

Peak CPK was 692. The patient had an uncomplicated course except for single episode of chest pain without EKG changes. He was discharged to be followed by Dr. Pizzarello in the future.

FINAL DIAGNOSIS: Anterolateral myocardial infarction.

Dictated by: Dr. O'Connell

O:RTS/mh
t:10/9
E34a

Information concerning the subsequent clinical course of this patient will be gratefully received.

# EXHIBIT 12

2

## PARK EAST CARDIOLOGY ASSOCIATES, P.C.

1421 Third Avenue
New York, New York 10028-1802
(212) 535-6340
Fax (212) 535-2618

Cardiovascular Disease

Martin E. Bloomfield, M.D. F.A.C.C.
Mark B. Schiffer, M.D., F.A.C.C.
Paul P. Romanello, M.D., F.A.C.C.
August 12, 1992


Dr. Michael Bruno
535 Park Avenue
New York, New York 10021

Re: Jules Robbins

Dear Dr. Bruno:

At your kind suggestion, Mr. Robbins was seen in our office on
the 11th of August, 1992 for cardiovascular stress testing and a
thallium perfusion study.

This is a 65 year old gentleman who carries a diagnosis of a
myocardial infarction dating back to 1980. He presented with
classic symptoms of a myocardial infarction including chest pain
radiating to the left arm and extreme diaphoresis. He was
treated at North Shore University Hospital and it was an
uncomplicated course. He also relates having a left heart cath
which reportedly showed "two blocked arteries with excellent
collaterals". He acknowledges having a prior stress thallium
done in Florida. His only chest pain syndrome appears to be a
musculoskeletal one over the left breast which gets worse with
deep breathing and is associated with mild tenderness on
palpation. He denies any known cardiac risk factors including
diabetes, hypertension, hyperlipidemia or tobacco use. His
anginal pain syndrome has been stable and he notes an active life
style with walking and swimming however, these are done at an
extremely low intensity. Current medications include Aspirin and
Inderal 40 mgs. TID. On physical examination his blood pressure
was 116/84. Cardiovascular exam was unremarkable.

Resting electrocardiogram (using stress electrode leads) revealed
a sinus mechanism at 53 beats per minute with normal PR and QRS
intervals. The mean QRS electrical axis was approximately 30
degrees. (This is a normal electrocardiogram.) He was then
exercised according to a standard Bruce Protocol for a total of
seven minutes, three seconds achieving a workload of 3.4 miles
per hour at a 14 degree grade. His heart rate started at 53
beats per minute and rose in a step wise manner to a maximum of
112 beats per minute. Resting blood pressure on the treadmill was
116/84 and by the last moment of exercise had increased to
134/72. The exercise was stopped because of an increasing
ventricular ectopy and fatigue. Chest pain was provoked
beginning in the fifth minute of exercise which persisted for
several minutes into recovery. Ischemic ST depressions are noted
in the second stage of exercise which consists of horizontal ST
depressions in the inferior leads and the lateral precordial

1

PARK EAST CARDIOLOGY ASSOCIATES, P.C.

1421 Third Avenue
New York, New York 10028-1802
(212) 535-6340
Fax (212) 535-2618

Cardiovascular Disease

Martin E. Bloomfield, M.D. F.A.C.C.
Mark B. Schiffer, M.D., F.A.C.C.
Paul P. Romanello, M.D., F.A.C.C.
Page 2
RE:  Jules Robbins

In the sixth minute, thirtieth second of exercise at a heart rate
of 106 with chest pain and ST segment depressions approximately
3.1 millicuries of thallous chloride was injected.  The exercise
was continued for thirty seconds and within three minutes he was
taken to the scintillation camera where images were obtained in
the anterior 40 and 70 degree left anterior oblique position.  He
returned to the office approximately three hours later where the
images were repeated.

The initial image reveals normal background activity.  Left
ventricular chamber size is slightly smaller post exercise.  The
right ventricle is identified and normal.  Distribution of
thallous chloride throughout the left ventricle is inhomogeneous.
A dense reversible decrease in activity is identified in the
apical half of the inferior segment which demonstrates complete
reperfusion.  There is a fixed decrease in activity involving the
entire anterior segment of the left anterior oblique 70 degree
view.  However in the absence of anterior infarct by EKG or
echocardiography this most likely represents attenuation due to
breast tissue.

In summary, this is a 65 year old gentleman with known coronary
artery disease and a reported stable chest pain syndrome.  In
this clinical setting with a normal cardiac exam he was able to
exercise to only 63% of his age predicted maximal heart rate
while provoking angina pectoris and electrocardiographic changes
of ischemia at a very low work load.  No auscultatory findings of
left ventricular dysfunction are appreciated.  Stress thallium
images reveal changes consistent with a highgrade obstruction,
most likely occurring in the right coronary artery.  Because of
the low double product achieved with exercise, this early
positive stress test may underestimate the extent of his disease.

Thank you for allowing me to partake in the evaluation of this
patient.

Most sincerely,

Paul P. Romanello, M.D. F.A.C.C.

PPR/so

# EXHIBIT 13

## ROY A. PIZZARELLO, M.D.
### NORTH SHORE UNIVERSITY HOSPITAL
300 COMMUNITY DRIVE
MANHASSET, NEW YORK 11030

DEPARTMENT OF MEDICINE
DIVISION OF CARDIOLOGY

\ PHONE 516-562-4100

April 13, 1981

RE:  ROBBINS, Jules

I saw Jules Robbins in follow-up on April 10, 1981.  Since I last saw him,
Mr. Robbins has been doing quite well.  He persists in having a mild
anginal syndrome that occurs at times of increased physical exertion and
increased emotional stress.  The episodes of angina that he does have are
mild and are quickly relieved with nitroglycerin.  He's had no progression
of his symptoms.  He denies any symptoms of congestive heart failure,
lightheadedness, palpitations, or syncope.  Otherwise, his interval history
is unremarkable.

His physical examination is essentially unchanged from before.  Blood
pressure was 110/60.  Pulse was 66 and regular.  Respirations were 14.
General exam was unchanged.  Lungs were clear.  Cardiac examination showed
the first and second heart sounds to be normal.  There was no murmur,
gallops, clicks or rubs audible.  There was no hepatosplenomegaly or
peripheral edema noted.  All peripheral pulses were intact.  The arteriotomy
site from the catheterization was well healed and his right radial pulse was
normal.

A 12-lead electrocardiogram taken today showed sinus rhythm.  Again, there
was evidence of an anteroseptal wall myocardial infarction.  His ST-T wave
changes that were previously noted are now back to normal.

It is my feeling that Mr. Robbins is doing quite well.  We can continue him
on his present medical regime of Inderal 40 mg q6h and nitroglycerin on a
PRN basis.  I've encouraged him to increase his activity gradually and I've
asked him to see me again in approximately four months.  In November of this
year I've recommended that he have a repeat stress test and to have an annual
stress test to follow the status of his coronary reserve.

Roy A. Pizzarello, M.D.

RAP/lrk

# EXHIBIT 14

**Edward J. Greaney, MD**
Murray Hill Medical Group, PC 317 E. 34th St. New York, NY 10016
Tel:212-726-7488 Fax:212-209-3288

December 1, 2003
Page 1
Chart Account

**JULES ROBBINS**
Male DOB:08/29/1926                    215473-0

Home: (212)879-7808
Ins: MEDICARE (284)

11/11/2003 - Office Visit: IOV-ejg
Provider: Edward J. Greaney MD
Location of Care: Edward J. Greaney, MD

## Office Visit

## History of Present Illness
History from: patient
Reason for visit: see chief complaint
Chief Complaint: IOV
History of Present Illness: well known from TH
admitted to RIRM for THR
developed SBO, requiring resectiona and colostomy
had long recovery
now much improved
still with edema
mucous leaks from rectum but no stool
for reversal 1/04

## Past, Family, and Social History
Past History: ashd s/p MI 1980, oa, htn, stable angina
PSH: volvulus s/p colon resection, L THR, hems, hernia
colon ~2001- Shinya, flu 11/03, pvax 11/03
Family History: F- X-colon ca- age 70s
M-X- gyn ca- age 70s
1 sis- murmur

Social History: watch dealer
widowed
3 children, 5 grandchildren
nonsmoker, soc etoh
exercise- walks, bikes, swimming

## Vital Signs
Weight: 170 pounds
Temperature: 98.6 degrees F
Pulse rate: 58
Respirations: 12
Blood Pressure: 100/60 mm Hg

## Physical Exam
General appearance: well nourished, well hydrated, no acute distress

## Respiratory
Respiratory effort: no intercostal retractions or use of accessory muscles

**Edward J. Greaney, MD**
Murray Hill Medical Group, PC 317 E. 34th St. New York, NY 10016
Tel:212-726-7488 Fax:212-209-3288

December 1, 2003
Page 2
Chart Document

## JULES ROBBINS
Male DOB:08/29/1926

215473-0

Home: (212)879-7808
Ins: MEDICARE (284)

Palpation: normal fremitus
Auscultation: no rales, rhonchi, or wheezes

### Cardiovascular
Palpation: no thrill or palpable murmurs, no displacement of PMI
Auscultation: S1, S2, no murmur, rub, or gallop
Carotid arteries: pulses 2+, symmetric, no bruits
Abdominal aorta: no enlargement or bruits
Femoral arteries: pulses 2+, symmetric, no bruits
Pedal pulses: pulses 2+, symmetric
Periph. circulation: 1+ edema L > R

### Gastrointestinal
Abdomen: colostomy
Liver and spleen: no enlargement or nodularity

### Lymphatic
Neck: no cervical adenopathy

### Musculoskeletal
Gait and station: normal, can undergo exercise testing and/or participate in exercise program

### Skin
Inspection: vitiligo

### Assessment
New Problems:
ATHEROSCLEROSIS, CORONARY (ICD-414.0)
HYPERLIPIDEMIA NEC/NOS (ICD-272.4)
HYPERTENSION, ESSENTIAL NOS (ICD-401.9)
S/P REDUCTIN OF VOLVULUS, INTUSSUSCEPTION,HERNIA (CPT-44050)
EDEMA/LOWER EXTREMITIES (ICD-782.3)
ANEMIA NOS (ICD-285.9)
VACCINE AGAINST STREPTOCOCCUS PNEUMONIAE (ICD-V03.82)
VFLU-VACCINE FOR INFLUENZA (ICD-V04.81)

Comments: Labs sent
pvax, fluvax
start lasix
CV evaluation

### Plan
New Prescriptions/Refills:
LASIX TAB 20MG (FUROSEMIDE) 1 po BID 11/11/2003 #60 x 3 : Edward J. Greaney MD

Updated Medication List:
TOPROL XL 50 MG TABSR24 (METOPROLOL SUCCINATE) i tab po qd
LIPITOR TAB 10MG (ATORVASTATIN CALCIUM) 1 po qd

**Edward J. Greaney, MD**
Murray Hill Medical Group, PC 317 E. 34th St. New York, NY 10016
Tel:212-726-7488 Fax:212-209-3288

*December 1, 2003*
Page 3
Chart Document

**JULES ROBBINS**
Male DOB:08/29/1926                    215473-0

Home: (212)879-7808
Ins: MEDICARE (284)

ASPIRIN TAB 81MG EC (ASPIRIN) 1 po qd
LASIX TAB 20MG (FUROSEMIDE) 1 po BID

**New Orders:**
...New Patient OV4 [CPT-99204]
..EKG (Tech) [CPT-93000,T]
Venipuncture (Doctor) [CPT-36415]
**CBC-85025 [CPT-85025]
**T4 [CPT-84436]
**TSH [CPT-84443]
**LIPID PANEL [CPT-80061]
**COMP. METABOLIC PANEL [CPT-80053]
Injection, Pneumovax [CPT-90732]
Injection, Pneumovax admin.-Medicare [CPT-G0009]
Injection, Flu Vaccine [CPT-90658]
Injection, Fluvax admin.-Medicare [CPT-G0008]

Immunization Administration Record
Record the following REQUIRED information for EACH immunization given: Date given, Lot No.,
Manufacturer, Route & Site, and Given by.

Immunization Administration Record
Record the following REQUIRED information for EACH immunization given: Date given, Lot No.,
Manufacturer, Route & Site, and Given by.

Immunization Administration Record
Record the following REQUIRED information for EACH immunization given: Date given, Lot No.,
Manufacturer, Route & Site, and Given by.

Record the following REQUIRED information for EACH immunization given: Date given. Lot No.,
Manufacturer. Route & Site, and Given by

**Immunization History**
TB - PPD

**Prescriptions:**
LASIX TAB 20MG (FUROSEMIDE) 1 po BID 11/11/2003 #60 x 3
    Entered, Authorized and Signed by:    Edward J. Greaney MD